762 S.W.2d 6 (1988)
CAMPBELL COUNTY, Richard Lackey, Kenton County and James A. Knauf, Movants,
v.
COMMONWEALTH of Kentucky, KENTUCKY CORRECTIONS CABINET, George Wilson, Gene Scroggy, John Rees, Steve Berry, Betty Kassulke and Al Parke, Respondents.
Clarence Leroy DAVIDSON, et al., Appellants,
v.
George WILSON, etc., et al., Appellees.
COMMONWEALTH of Kentucky, CORRECTIONS CABINET and George W. Wilson, Secretary, Appellants,
v.
Harold BUCHIGNANI and Keith A. Moore, et al., Appellees.
Nos. 87-SC-268-DG, 87-SC-332-TG and 88-SC-232-TG.
Supreme Court of Kentucky.
September 8, 1988.
Rehearing Denied January 19, 1989.
Barbara Jones, Connie Malone, David A. Sexton, Corrections Cabinet, Frankfort, for Corrections Cabinet, etc.
Paul H. Twehues, Jr., Newport, for Campbell County.
Martin J. Huelsmann, John R. Elfers, Covington, for Kenton County.
*7 Allison Connelly, Burgin, Tim Riddell, Asst. Public Advocate, Frankfort, for Davidson, et al.
Edward W. Gardner, Lexington, for Buchignani.
Allison I. Connelly, Kenneth R. Taylor, Burgin, for Moore, et al.
LEIBSON, Justice.
These cases present a bizarre picture of convicted felons and parole violators fighting for the right to get into state prison, joining with county officials trying to put them there. We have decided they have that right.
These are prisoners held in county jails who have been ordered by circuit courts committed to the custody of the Kentucky Corrections Cabinet to carry out their sentence, but the Corrections Cabinet has refused their custody.
In each case the judgment or order directs the Sheriff of the County to deliver the prisoner into the custody of the Department of Corrections at such location within this Commonwealth as the Department shall designate. But the Corrections Cabinet has refused transfer. By regulation (Corrections Policies and Procedures No. 17.3, eff. 10/14/85) it established an internal policy to control the intake of prisoners into state custody. The purpose is to reduce overcrowded conditions that exist in some state penal facilities. This plan, known as the controlled intake policy, refuses to accept transfer of state prisoners from the local county jails to state penal facilities except on a space available basis. Further, it provides a prisoner assessment and classification procedure to regulate making the decision as to when to accept state prisoners. The prisoners, the local county fiscal courts, or both, are complaining this arrangement violates their rights to have the prisoners housed within the state system.
The issue requires us to interpret and apply the Kentucky Constitution and certain statutes. The Constitution, § 254, provides:
"The Commonwealth shall maintain control of the discipline, and provide for all supplies, and for the sanitary condition of the convicts."
"Convicts" means "persons convicted of felonies and sentenced to confinement in the penitentiary as provided by Section 253, Kentucky Constitution." Briskman v. Central State Hosp., Ky., 264 S.W.2d 270, 271 (1954). The statutes and rules involved are KRS 532.100, KRS 431.215, and RCr 11.22.
KRS 532.100 specifies the "Place of imprisonment" for convicted felons. It provides when a sentence for a felony is imposed "the court shall commit the defendant to the custody of the corrections cabinet for the term of his sentence and until released in accordance with the law."
AOC Form 79-450, prepared by the Administrative Office of the Court of Justice to comply with the Constitution and the statutory mandate, includes in the court "judgment and sentence" the following:
"It is further ORDERED that the Sheriff of ____ County deliver the defendant to the custody of the Department of Corrections at such location within this Commonwealth as the Department shall designate."
Each convicted felon who is a party to these law suits has been so sentenced, but the Corrections Cabinet (the substitute name for the Department of Corrections) has refused to accept delivery.
KRS 431.215, styled "Conveyance of prisoner to institution of confinement," specifies that the judgment imposing a sentence of incarceration "shall be furnished forthwith to the sheriff who shall execute the same by delivering the defendant and a certified copy of the judgment to the person in charge of the penitentiary, jail [if a misdemeanor] or institution of confinement and making a written return thereof in the office of the circuit clerk within ten (10) days after the execution."
KRS Chapter 197, styled "Penitentiaries," provides for the care and custody of convicted felons who are to be confined in "state penal institution." KRS 197.065 provides for "Classification and segregation *8 of prisoners in penal institutions [and] Transfer between institutions," all of which is the responsibility of the Corrections Cabinet. It is by reason of these statutes that judgments entered upon conviction for felonies, rather than specify a particular state penal institution, simply order that the sentence shall be carried out by delivering the prisoner into the custody of the Department of Corrections.
The Corrections Cabinet argues that nothing in this constitutional and statutory scheme mandates that the Cabinet, the responsible agency of state government, must accept delivery of convicted felons who have been ordered committed to its care. The Cabinet provides strong practical reasons related to the overcrowded conditions of state penal institutions, some of which are under caps included within federal court orders restricting the number of inmates in designated institutions.
KRS 197.110 confers upon the Corrections Cabinet the power and responsibility to make "rules and regulations as it deems necessary and proper in relation to [inter alia] [t]he classification of prisoners." Using this authority to enact regulations, and the power granted in KRS 196.030 to "exercise all functions of the state" related to "[m]anagement of penal, reform and correctional institutions," the Corrections Cabinet has instituted by regulation its procedure for "controlled intake of inmates." CPP 17.3, supra. This controlled intake procedure expresses the "policy" of the Cabinet "not [to] exceed the inmate housing capacity of its adult correctional institutions," and then provides for an "Assessment and Classification Center" to "notify the sheriff and jailer regarding the date the prisoner is to be transported to the institution." The net effect is the Corrections Cabinet assumes complete and final authority and control over the decision as to when state government will take custody of prisoners held in local jails who have been ordered committed to state custody by authority of the Constitution, of pertinent statutes, and of court sentences and court orders mandating transfer to its custody.
The Corrections Cabinet claims the Constitution and the statutes involved do not, in so many words, order the state to accept the prisoners. Further, the Cabinet claims because the controlled intake procedure was adopted as a regulation effective October 14, 1985, and the General Assembly has not countermanded this regulation by subsequent legislation since then, the General Assembly has in effect ratified the controlled intake procedure sub silentio.
The Corrections Cabinet claims KRS 441.025(1), 441.206(1), and 431.215(2) implicitly recognize that prisoners who have been sentenced to confinement in the penitentiary can be held in the county jails indefinitely, because these statutes provide for a fee payable from the State Treasury contributing toward their upkeep "beginning on the fifth day following the day on which judgment was rendered and ending the day that the [convicted person] is delivered to the penitentiary."[1]
The statutes cited by the Corrections Cabinet fall far short of a countermand to KRS 532.100, which directs the courts in sentencing a convicted felon to commit such person to the custody of the Corrections Cabinet, and of KRS 431.215(1) which directs the Sheriff to carry out this order by transmitting and transferring the convicted felon to the state penal system. The language of subsection (2) of 431.215 does no more than accommodate the period reasonably necessary for the sheriff to accomplish the procedure set out in subsection (1). It reenforces, rather than excuses, the constitutional and legislative mandates elsewhere expressed.
For almost 100 years no one has seriously questioned the constitutional mandate that state prisoners must be kept in the care and custody of the state penal system. The reason for doing so now is not because of any difficulty in its meaning, but because of a perceived need to evade this *9 constitutional responsibility in response to federal court orders limiting the number of prisoners in state institutions.[2] However, there is no principle of constitutional construction more firmly fixed than that "[c]onstitutional provisions . . . are to be enforced according to their letter and spirit, and cannot be evaded by any legislation [or regulations] which, though not in terms trespassing on the letter, yet in substance and effect destroy the [constitutional] grant or limitation." Commonwealth v. O'Harrah, Ky., 262 S.W.2d 385, 389 (1953).
"If the language of the Constitution is to be rewritten, it should be done by constitutional amendment, by vote of the people, and not as a matter of judicial expediency. Where the words and meaning of the constitution are reasonably in doubt, we can think in terms of contemporaneous construction. But when called upon to approve a transparent evasion of the plain meaning of the constitutional provisions, we should do so without regard to whether the decision will be unpopular." Hayes v. State Property and Bldgs. Com'n, Ky., 731 S.W.2d 797, 806-07 (1987). Dissenting Opinion by Leibson, J.
The Corrections Cabinet has argued that when transfer is refused pursuant to the controlled intake procedure, even though the prisoners then remain in the county jail subject to neither custody, control nor supervision within the state penal system, they may still be viewed as state prisoners rather than local prisoners because they are retained in local custody by virtue of the regulation of the state agency. However, even if we were to assume some de facto acceptance and approval from the General Assembly by its failure to countermand the regulation by legislation in the two legislative sessions since adoption of the controlled intake procedure, the constitutional violations cannot be waived or preempted any more through a position taken by the General Assembly than through a position taken by the executive agency. The fact is the prisoner remains in local custody when the Kentucky Constitution mandates state custody. In either instance, the language of Fannin v. Williams, Ky., 655 S.W.2d 480, 484 (1983) applies:
"We cannot sell the people of Kentucky a mule and call it a horse, even if we believe the public needs a mule."
We cannot transfer the duties imposed upon state government to county government by legislation, by regulation, or by judicial action, even if such change would be beneficial. As we stated in Fannin v. Williams, supra, "[i]f the people of Kentucky wish to change their position in this matter, it is their right to do so" by constitutional amendment, but this is the only procedure available to accomplish such a change.
Against this background we turn now to the specific facts in each case.

I. COMMONWEALTH V. BUCHIGNANI, MOORE, ET AL.

APPEAL FROM FAYETTE CIRCUIT COURT
In May and June, 1984, several pro se petitions for writ of habeas corpus were filed in the Fayette Circuit Court by sentenced felons and parole violators, demanding they should be delivered immediately to the custody of the Kentucky Corrections Cabinet. The Fayette Circuit Court certified these claims as a class action on behalf of all persons in Fayette County Jail similarly situated. Ultimately Fayette Circuit Court directed the Cabinet to accept custody upon thirty days' notification. This order was entered March 13, 1986. Lexington-Fayette Urban County Government and the county jailer intervened. Their interest is in requiring payment to compensate for the financial loss borne by the county because of the difference between the cost of maintaining these prisoners in jail and the supplemental fee paid per day for each prisoner from the state treasury, which is $15-20.
*10 The Corrections Cabinet did not appeal, but refused to comply. On July 24, 1986, the court held a contempt hearing in which the Corrections Cabinet was to show cause as to why it should not be held in contempt, and punished accordingly, for failure to comply. Following the hearing the court entered the contempt order, now appealed, specifying this was a continuing contempt and imposing a fine for all prisoners held thereafter in violation of previous orders, on a sliding scale: $22 per day per prisoner who remains after thirty days and up to forty days; $25 per day per prisoner after forty days and up to fifty days; $28 per day per prisoner after fifty days up to sixty days; and $50 per day per prisoner for periods more than sixty days. The court treated these contempts as civil contempts, and ordered the fines collected to be dispersed 85% to Lexington-Fayette Urban County Government, which must bear the expense for keeping these prisoners, and 15% to Fayette County Legal Aid Inc., which almost always bears the expense for representing these prisoners.
We granted transfer of this appeal because of the two other cases with similar issues already before our Court.
At the contempt hearing in Fayette Circuit Court, the Corrections Cabinet maintained it was impossible to comply with the previous mandamus order because of state prison overcrowding conditions and federal court limitations on the number of prisoners. The Corrections Cabinet presented evidence that it is under orders from twelve courts, both state and federal, directing it to receive convicted felons and parole violators on various terms and conditions, and the Corrections Cabinet argues that given the number of beds available in its penal institutions, the controlled intake procedure is an adequate response to foreclose a finding of contempt.
The county/jailer and the prisoners point out the Commonwealth did not appeal the original mandamus order, now two years old, nor indeed any of the twelve court orders requiring the Cabinet to accept these prisoners. The Cabinet, representing the Executive Department, offers as an explanation that it did not appeal because it could not anticipate problems that would be caused by new statutes from the Legislative Department increasing criminal penalties and minimum length of incarceration before parole, statutes such as "truth-in-sentencing," enacted in 1986. The Cabinet also complains of "the increase of Kentucky's persistent felony offender convictions since 1975," but this complaint seems irrelevant in the present case where most of the increase presumably took place before Fayette Circuit Court entered its mandamus order in 1984. In sum, Corrections Cabinet is satisfied that its controlled intake procedure is both an appropriate response and a complete defense.
A party cannot be punished for contempt for failure to perform an act which is impossible. Clay v. Winn, Ky., 434 S.W.2d 650 (1968); Tucker v. Commonwealth, 299 Ky. 820, 187 S.W.2d 291 (1945). However, an inability to comply must be shown clearly and categorically by the defendant. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1949). Defendants so claiming must also prove they took "all reasonable steps within their power to insure compliance with the orders." Sekaquaptewa v. MacDonald, 544 F.2d 396, 406 (9th Cir. 1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977). Kentucky recognizes this defense of impossibility to comply in Tucker v. Commonwealth, supra, but requires proving lack of fault to successfully defeat the contempt charge. 187 S.W.2d at 294-95. Fayette County, and its jailer, respond that the trial court found Corrections presented insufficient evidence to establish an impossibility defense, and this finding was not "clearly erroneous." CR 52.01.
The evidence before the trial court was that the controlled intake procedure, per se, was inadequate. There was evidence other remedies were available, such as extending operation of the controlled intake procedure from a central location to local facilities so as to rapidly identify those prisoners awaiting transfer who would be acceptable in minimum security institutions where *11 beds are available[3] and funding from the Governor's emergency funds which has been utilized in the past to relieve overcrowding when faced by court orders.
Further, appellees suggest that state officials faced with relieving overcrowding in one jail can contractually provide for state use of facilities in other counties where space is available, i.e., contract for the use of county and regional jails to care for state prisoners as agents of state government. This, of course, presupposes care of state prisoners under state supervision and payment of a mutually agreeable sum to cover the cost of use of county services.[4]

II. CAMPBELL & KENTON COUNTIES V. CORRECTIONS CABINET
In both Campbell and Kenton counties a suit was filed on behalf of county fiscal court alleging the Corrections Cabinet and the components of the state penal system had violated the duty imposed by KRS 431.215 and RCr 11.22 by refusing to accept transfer of convicted felons, the local jail was full to capacity and impaired in performing its functions because of overcrowding, the claimants have suffered immediate and irreparable damage of a continuing nature, and they are entitled to injunctive relief and damages for expenses incurred from the Corrections Cabinet's failure to comply with its legal duties. After an evidentiary hearing, the Campbell Circuit Court granted the requested injunction on February 27, 1985, ordering that all prisoners sentenced to a state penal institution presently incarcerated in the Campbell county jail should be immediately accepted into state penal institutions, and further ordering that in the future these prisoners should be accepted within ten days of sentencing or, if the jail had a population of sixty or more (the jail inmate population was limited to sixty-six by federal court order), the prisoners were to be accepted immediately.
The Kenton Circuit Court had granted a temporary injunction of similar import on the day the complaint was filed. Neither injunction had been appealed.
Subsequently, both Campbell County and Kenton County filed motions requesting the defendants, along with Steve Berry, Classification Manager in the Corrections Cabinet, be held in contempt for failure to accept all such prisoners as required. The circuit judges from each County held a joint evidentiary hearing on December 6, 1985, and on December 13, 1985, both issued contempt orders against the defendants. The orders gave ten days to accept these prisoners and thereafter the appellees were to pay a fine of $100 per day for each inmate still remaining in either jail.
Additionally, Campbell Circuit Court ordered payment of an additional fine of $3,360 for costs incurred by the County in housing and transportation of inmates who could not be kept in the local jail because of conditions of overcrowding resulting from the failure to accept state prisoners, as well as payment of any actual expenses resulting from the housing of state prisoners in its jail.
The Corrections Cabinet and other defendants appealed. While not denying they were refusing to accept prisoners as required by the court's order, they maintained successfully in the Court of Appeals that they were simply unable to comply with these court orders.
The Court of Appeals recognized that both Campbell and Kenton Counties are under federal court orders limiting the number of inmates in their jails. However, the Court noted the Corrections Cabinet and its officials "also faced difficulties in managing the (state) prison population," citing to the federal court order issued pursuant to Kendrick v. Bland, 541 *12 F.Supp. 21 (W.D.Ky. 1981) and the space standards of the American Correctional Association which requires sixty square feet of space per inmate. Apparently, the Court of Appeals was satisfied that through the controlled intake procedure developed by the Corrections Cabinet and the efforts made to expand the number of beds in the system, the Corrections Cabinet and its officials were doing all that could be reasonably expected to comply with court orders. The Court of Appeals reversed the Campbell and Kenton Circuit Courts' judgments of contempt.
The Court of Appeals' Opinion is challenged on three grounds:
1) The judgments first entered pursuant to the Complaints, enjoining the Corrections Cabinet and its officials from refusing prisoners, were not appealed and were therefore the law of the case.
2) The Court of Appeals' finding that the Corrections Cabinet and its officials are not in contempt because they are unable to accept these prisoners in present circumstances is a substitution of fact-finding, not just a different conclusion of law.
3) Assuming the Court of Appeals' decision should be treated as correcting an erroneous legal conclusion, nevertheless it is internally defective because, although it states "[t]he judgment is reversed," there was no majority supporting the "inability to perform" defense. Of the three judges on the panel, one categorically accepted as a fact "the impossibility of complying fully with the orders," a second concluded it was "not absolutely impossible for the appellants to accept each properly sentenced inmate," and the dissenter stated "this inability has not been adequately demonstrated."
We accepted discretionary review.

III. DAVIDSON, ET AL. V. CORRECTIONS CABINET
This was a class action filed on behalf of convicted felons and parole violators who had been refused transfer to a state penal institution, seeking mandamus from the Daviess Circuit Court compelling the Corrections Cabinet to accept their transfer, and claiming that failure to do so is a violation of constitutional and statutory rights, the rules of criminal procedure and court judgments and orders committing their custody to the Corrections Cabinet in the state penal system. The lead plaintiffs had been held in county jail awaiting transfer, variously, 287 days, 174 days, 152 days, and 89 days. They had been refused transfer under the controlled intake procedure. Inmates similarly situated from other counties where there were court orders capping the prison population, state and federal, are given priority[5] over inmates from Daviess County where there is no court ordered population cap.
CPP 17.3 prioritizes the intake of state prisoners first and primarily on the basis of whether the inmates are in a local facility under court order limiting inmate population. After that the order of admission is as follows: escapees, medical or security cases, and all other inmates. CPP 17.3 specifies no time limitation in which sentenced felons are to be accepted into the state correctional system and thus those inmates in Daviess County Jail were being held indefinitely.
The position of the inmates is, regardless of the availability of beds in the state penal system, the Constitution, statutes, Rules of Criminal Procedure, and court orders of commitment, separately and collectively require the state to take custody and responsibility for the care of these convicted felons within a reasonable time, the days involved in their cases are conclusively *13 unreasonable, and the court should fix a reasonable time in which these sentenced felons and state prisoners must be accepted into the state facilities.
The position of the Corrections Cabinet is that the Constitution simply requires the state to provide for these prisoners; this is done by paying the fee established by the General Assembly to county facilities until such time as they are transferred to state custody, and the Constitution and these statutes give no substantive rights to the prisoners to demand housing and care within the state penal system.
The Corrections Cabinet finally conceded at oral argument that a convicted felon does have a right at some point to be put into a state penal institution, and the ultimate question is simply the length of time before it becomes unreasonable for the Corrections Cabinet to continue to refuse commitment. The Corrections Cabinet then took the position that, since KRS 532.070(2) permits Class D felons to be committed to county jails for one year, and since misdemeanants can be held there for up to one year, housing felons up to one year is not unreasonable. The Corrections Cabinet argues acceptance of the controlled intake policy by the General Assembly implied from providing for payment of a fee to county jails to house sentenced felons in KRS 441.025(1), and in the subsequent budget appropriations.
The Corrections Cabinet concedes there are certain facilities available within the state penal system which are not available in county jails: recreation, education, work opportunities, and rehabilitation programs. Some county jails make efforts in this direction, but these efforts are far short of the programs available in state facilities.
One critical point made on behalf of the prisoners, which is not contested, is that state rehabilitation programs, which the Parole Board considers essential before parole, are not available in county jails.
Another arguing point not substantially refuted which we have previously discussed is that the classification procedure could be significantly improved by requiring state correctional officials to come to the local jails to effect immediate classification of prisoners, thus identifying those who could be sent to minimum security institutions where there is space available, and thus eliminating at least these convicted felons from the long wait imposed by the limited capacity in medium and maximum security facilities.
The Daviess Circuit Court concluded that the policy and practice of the Corrections Cabinet in delaying acceptance of convicted felons in the Daviess County Jail did not impose upon the rights of the petitioners sufficiently to "mandate the granting of a writ of mandamus." The court decided it was "unable to state as a matter of law that the conditions of the Daviess County Jail and/or the actions of the Defendants [Corrections Cabinet] are in violation of constitutionally protected rights." The petitioners have appealed, and we have granted transfer to consolidate with the two other cases with similar issues.

IV. CONCLUSION
In Tate v. Frey, 735 F.2d 986 (6th Cir. 1984), the United States Sixth Circuit Court of Appeals upheld the decision of the trial court specifying thirty days as the maximum limit in which to accept transfer after final sentencing from Jefferson County Jail to a state facility. The court denied the legality of the longer periods implemented through the controlled intake procedure, stating that through this procedure the Corrections Cabinet has "refused to timely accept convicted felons as required by state law." 735 F.2d at 989.
The Court stated:
"A review of Kentucky state law indicates that the responsibility to provide for the confinement of convicted felons rests upon the state. Kentucky Revised Statute § 532.100 provides that convicted persons be committed to the state for incarceration." Id.

We agree. The Kentucky Constitution imposes responsibility on the state prison system to take custody of convicted felons and to supervise their care. We agree that the Constitution, the statutes, and the *14 Rules of Criminal Procedure impose a duty on the courts to order convicted felons be transferred to the custody of the state, meaning the state penal system operated by the Corrections Cabinet, and a duty on the Sheriff to carry out these orders. By fixing these responsibilities the Constitution and statutes necessarily create corresponding rights for prisoners being held for an unreasonable length of time in the county jail to insist upon transfer, and for county governments who are being forced to bear the expense for such prisoners when such expense is by law the state's obligation.
The Corrections Cabinet claims through the controlled intake procedure it is doing all that it can do in this matter, which should shield it from the charge of contempt. The question addresses itself, initially, to fact-finding by the circuit court, and in three instances the county government has proved to the satisfaction of the trial court that the contempt remedy is appropriate. The adequacy of the controlled intake procedure was in dispute, as was the Corrections Cabinet's refusal to come to the county jails and undertake an assessment and classification procedure to determine which prisoners could be transferred immediately into waiting minimum security beds.
In Board of Councilmen v. Commonwealth, 243 Ky. 633, 49 S.W.2d 548 (1932), the question presented was whether the ordinance of the City of Frankfort regulating the sale and inspection of milk applied to the state penal institution located within the confines of the city limits. Our Court held it did not; the constitutional mandate gave exclusive responsibility to state government for the care and control of persons committed to the state penal institution. This responsibility of state government could not be shifted to local government. Nor can it be evaded by shifting blame between the executive and legislative department. It is no answer to the contempt charge that the legislature has greatly increased the need for beds by new criminal sentencing statutes, or that it has failed to sufficiently expand the size of the system. The state as a whole must absorb the responsibility.
This then is the fundamental flaw in the Corrections Cabinet's defense based on inability to comply. The Constitution assigns the responsibility for care and custody of convicted felons to state government as a whole. The Corrections Cabinet is the correct point to impose responsibility only because it is the agency created by the General Assembly to carry out this function. It is not enough to create the agency. It must then be provided with sufficient funds for buildings, facilities and services necessary to provide for all such persons who become state prisoners by operation of state penal statutes. The basic equation is the state cannot pass penal statutes and create penalties that generate more prisoners than it is willing and prepared to provide for.
Therefore, the state government, as a whole, is not unable to perform even if some individual agency, or party defendant, could claim otherwise. When the circuit courts held the Corrections Cabinet in contempt and fined it accordingly, it was in effect a fine imposed on the state government as a whole, which must be met one way or another, by funds from the state treasury. In the last analysis the burden will fall on the legislature to generate and appropriate enough funds to provide beds and services to meet the number of prisoners it generates with new statutes, or to enact new legislation cutting back on numbers convicted and sentenced to the state penal system or length of their stay, thus reversing the chain of events the General Assembly has initiated.
The effect of the federal court's decision in Tate v. Frey, supra, is that state government cannot shift the burden for overcrowding in prisons to the local level. The effect of our decision upholding the contempt orders from various circuit courts is to impose the burden for correcting the overcrowding problem back on state government where it belongs.
Our decision does not imply that state government cannot contract with county government and county (or regional) jail *15 facilities to house and care for state prisoners as agents caring for state prisoners under the direct supervision of state government. Where there is space and available facilities, and those facilities are adequate to meet minimum standards for care of state prisoners, and at a fee mutually agreed upon as adequate to cover the expense, the state may contract to provide for the carrying out of its constitutional responsibility. However, it cannot by statute or by executive regulation, directly or indirectly, impose that constitutional responsibility on the counties nor compel the counties to bear the expense attendant to such responsibility.
The next question is at what point does it become clearly unreasonable to refuse to accept convicted felons into the state system? This is a factual question which addresses itself first to the fact-finding of the circuit court where the litigation is pending. The circuit court's decision should not be set aside unless it is clearly erroneous. Three circuit courts in two of these cases (Fayette and Campbell/Kenton), at the instance of the counties involved, have made such a determination, and in none of these instances does the evidence compel a different result.[6]
This leaves one remaining question raised by the inmates' appeal in the Daviess County case, Davidson, et al. v. Corrections Cabinet. Did these Daviess County prisoners have a right to demand that circuit court set a limit on the time finally sentenced felons and parole violators could be held in the county jail, and did the circuit court err in refusing a writ of mandamus directing the Corrections Cabinet to accept prisoners into a state penal institution within a specified period of time?
As previously stated, the Corrections Cabinet ultimately conceded such a right would exist at some point, claiming one year was the appropriate time limitation. We cannot agree. The one year maximum is for misdemeanants and for Class D felons who are being sentenced as misdemeanants. It is not a transposable maximum. A person convicted as a misdemeanant remains subject to the continuing jurisdiction of the local judge, who can suspend further sentence, can offer work release programs, can exercise the right of parole, etc. However, ten days after a convicted felon is committed to the custody of the Corrections Cabinet the circuit judge has no more control over that prisoner. At that point the convicted felon is, as a general proposition, committed in county jail facilities that are not the equal of state penal institutions in providing opportunity for exercise, recreation, education, and above all rehabilitation programs both intrinsically beneficial and extrinsically essential to parole considerations.
In the twelve court orders entered so far mandating the Corrections Cabinet take custody of convicted felons, the range of time has been from immediately to forty-five days. We recognize that county government, because of the expense, probably has a greater problem of urgency than the convicted felon. At least, the felon gets credit towards his length of sentence for time served in the county jail facility after sentencing. Nevertheless, it is difficult to justify any convicted felon being denied the right to undergo the classification procedure promptly, and, if eligible for minimum security classification where institutional space is available, being so transferred within a few days. These Daviess county inmates want transfer to and acceptance within a state penal institution as mandated by the Constitution, various statutes and the court order directing their transfer. It is intolerable that any state prisoner, regardless of space availability, should be refused an order compelling transfer into the state penal system beyond forty-five days, which is the longest period specified thus far in any court order. Christian Circuit Court No. 85-CI-361; Jessamine Circuit Court No. 85-CI-218. The evidence presented in the Daviess Circuit *16 Court compelled such a finding, and the trial court's decision to dismiss was clearly erroneous. Davidson v. Wilson, et al., is reversed and remanded to the trial court to reconsider in light of this decision, imposing appropriate sanctions against the Corrections Cabinet if there is a subsequent failure to comply. Contempt proceedings, not release of prisoners, is the appropriate remedy if such an order is disobeyed.
In the Fayette County case and in the Campbell/Kenton County cases we affirm the contempt orders issued by the trial courts. However, Fayette County Legal Aid Inc. was not a party to the litigation in the Buchignani case (88-SC-232-TG), and the trial court had no authority to order payment to a nonparty. Therefore, so much of the order of Fayette Circuit Court as so provides is vacated.
We reverse the decision of the Court of Appeals vacating the contempt order in the Campbell/Kenton County cases.
The Corrections Cabinet contends the fines levied in these cases are excessive and inappropriate. The fines are not excessively large considering the conduct involved and its consequences. These cases are properly classified as civil contempt cases, and, as such, it is appropriate that the court order the fines paid to the aggrieved party, rather than to the Commonwealth.
STEPHENS, C.J., and GANT, LAMBERT and STEPHENSON, JJ., concur.
WINTERSHEIMER, J., concurs in results only and files a separate concurring opinion.
VANCE, J., dissents as to so much of the Opinion as requires the transfer of prisoners from county jails where the county is agreeable to housing the prisoners.
WINTERSHEIMER, Justice, concurring.
I concur with the result achieved by the majority but wish to state my views separately.
These cases of prison overcrowding arose originally in Campbell and Kenton Counties and were quickly joined by jailers and other county officials from other large Kentucky counties. The Kentucky Corrections Cabinet, as a state agency, and certain of its officials, have been held in both civil and criminal contempt for failing to comply with injunctions requiring corrections to accept for incarceration prisoners sentenced on felony convictions.
Corrections does not deny its legal duty to accept such prisoners pursuant to KRS 431.215 and RCr 11.22 and it does not deny its failure to comply fully with the court injunctions. The argument it presents centers around inadequate funding, conflicting federal and state court orders and its good faith efforts to comply. The ultimate responsibility for solving this problem lies primarily with the legislature. The underlying problem is that the prisoners in question have been held in the county jail for periods ranging from three to nine months since their final sentencing and whether they have a statutory and constitutional right to be in a state penal institution.
Section 254 of the Kentucky Constitution provides that the Commonwealth shall maintain control and discipline of the convicts. That is, those who have been convicted of felonies and sentenced in the penitentiary pursuant to Section 253 of the Kentucky Constitution.
KRS 532.100 provides that a sentencing court shall commit the convicted defendant to the custody of the Corrections Cabinet. AOC form 79.54 provides that the sheriff deliver the defendant to the custody of the Department of Corrections at such locations within the Commonwealth as the Department shall designate. Normally penitentiaries are provided for the care and custody of convicted felons who are to be confined in state penal institutions. KRS 197.010(3) defines penitentiaries to include certain named or similar institutions. I do not believe that prohibits temporary lodging of felons at equivalent facilities. However, that does not imply that corrections can indefinitely incarcerate a prisoner in a county jail.
*17 My principal difference with the majority opinion is that I believe that the law of Kentucky requires that convicted felons be committed to the custody of the Corrections Cabinet for imprisonment in an appropriate penal facility with proper security and safety as well as decent conditions consistent with state laws. The exact location of each commitment is of secondary importance. I do not believe that precludes appropriate contractual arrangements with public or private jail facilities to house convicted felons.
There are no simple solutions to the problem of prison overcrowding. It is not an answer to shift the problem from the state to the local government. Since the number of inmates confined at the Kentucky State Reformatory was limited by a federal court order in Kendrick v. Bland, 541 F.Supp. 21 (W.D.Ky. 1981), the state has transferred a substantial burden for housing convicted felons to twelve of Kentucky's larger counties. At one time, the Kentucky Jailers Association agreed to accept, and the State agreed to pay, $10 per day per prisoner, while in local jails. The proof presented in the Campbell and Kenton county cases indicates that such sum was grossly inadequate. It has been argued that it costs the State approximately $30 per day for a prisoner, and the difference obviously shifts the burden for a substantial number of prisoners to the counties. The state may save, but the counties suffer severely. The taxpayers of the entire state need to share the burden of criminal facilities as distinguished from individual counties.
As an example, the Campbell County Jail has been frequently overcrowded requiring the county to transport a variety of prisoners to other jails in other counties. This results in a substantial financial burden on Campbell County because the county had to pay not only for housing and boarding its own prisoners at another jail, but also to pay the costs of transporting and guarding these prisoners. It is obvious that some kind of state and county contractual arrangement will be continued for some time in the future. However, the state needs to take a more realistic and equitable view towards the proper incarceration of convicted felons when it is deemed necessary to lodge them in a local county jail. The Corrections Cabinet must renegotiate the daily allowance to be paid for the housing of felony prisoners outside its own specific physical units. It must also cooperate in and supervise the upgrading of local facilities so that they meet appropriate state standards for prison incarceration.
The prisoners involved do not have a right to be incarcerated in a specific state penal building but rather, I believe they have only a right to be imprisoned in the equivalent of a state penal institution. The state prisoner should be promptly classified and assigned to an appropriate institutional space. If that is outside the physical units provided by the state then the local government or other agency providing for such housing shall be equitably compensated.
Consequently, I would affirm the decisions of the circuit courts involved.
NOTES
[1] KRS 431.215(2), as enacted in 1984, provided that this fee would be $10. In 1986, this section was amended to delete the specified amount, and the amount is now covered by an appropriation to the state budget. We are advised that the amount as provided by the current budget covers a payment of $13.50 per day. However, the actual cost of upkeep is $25 to $30 per day.
[2] One or several of these orders are agreed orders, and none of have been furthered appealed.
[3] As opposed to medium and maximum security institutions subject to the caps in federal orders.
[4] We take judicial notice a bill was introduced at the 1988 Legislative Session, and not acted upon, 1988 HB 692, offering a somewhat similar solution, to wit: transferring to the Corrections Cabinet custody control of county and regional jails, with the responsibility for maintaining acceptable living conditions and paying the cost. This bill sought to address many of the problems involved in the present law suit. We do not comment on its constitutionality.
[5] For example: in one instance, Tate v. Frey, 735 F.2d 986, 990 (6th Cir. 1984), the Jefferson County case, the United States Circuit Court upheld a finding of "constitutional violations of inmates rights" by state officials "upon federal constitutional grounds and not state law." The U.S. District Court had found that as a result of the overcrowded condition of the jail, inmates were required to sleep on tables, shelves and floors. It mandatorily enjoined the state correctional officials to immediately reduce the number of convicted felons awaiting transfer to state facilities incarcerated in the Jefferson County Jail, and ordered that such persons held more than thirty days from the imposition of sentence must be released. While we accede to the power of the Federal Court to order release, we do not agree that release is the appropriate remedy.
[6] Therefore, we need not decide whether the Corrections Cabinet lost its right to appeal the initial decisions because it failed to appeal from the original judgments, instead waiting to appeal until held in contempt of court.