RENDERED: MARCH 10, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0237-MR

JOHN H. SCHNATTER                              APPELLANT

v.                    APPEAL FROM OLDHAM CIRCUIT COURT
HONORABLE DOREEN GOODWIN, JUDGE
ACTION NO. 19-CI-00740

ANNETTE M. COX AND MELANIE
STRAW-BOONE                             APPELLEES

OPINION AFFIRMING IN PART
AND REVERSING IN PART

** ** ** ** **

BEFORE: ACREE, EASTON, AND JONES, JUDGES.

EASTON, JUDGE: The Appellant, John H. Schnatter ("John"), seeks relief from

the Oldham Family Court's order, which found him in contempt for violation of

that court's order incorporating the parties' Dissolution Settlement Agreement

("DSA"). The family court ordered John to pay attorney's fees. The family court

also prohibited John from entering a specific condominium building at any time.

Having reviewed the record, we affirm the finding of contempt and the awarding of attorney's fees but reverse the order banning John from the condominium building at any time, as that is contrary to the DSA and was not requested.

## FACTUAL AND PROCEDURAL HISTORY

John and the Appellee, Annette M. Cox ("Annette"), were married in 1987. Prior to the filing of the divorce by Annette in late 2019, John and Annette reached an agreement after a mediation in September of 2019. This agreement became the DSA. The Oldham Family Court entered a final decree of dissolution, incorporating the DSA, on December 18, 2019.

For the purposes of the contempt order, the governing portion of the DSA revolves around condominium units in the Remington at Bay Colony (the "Remington") in Naples, Florida. The parties owned and used unit 2201 in the Remington during the marriage for over twenty years. Eight days prior to the parties' mediation, John purchased unit 404 in the Remington for $4.3 million. The price usually would not be relevant, but it became relevant in the context of John's future actions with respect to the sale of that unit.

Under the terms of the DSA, Annette was awarded condo unit 2201. John was awarded unit 404; however, John agreed to "sell" unit 404 within a "reasonable period" after the completion of the mediation. Additionally, John

agreed he would not be present at the Remington if Annette was going to be there.

The controlling DSA provision states:

> 3.(A)(2) <u>Remington Bay Colony Unit 404 Naples,</u>
> <u>Florida</u>.  John shall retain the condominium property
> located at the Remington Bay Colony, Unit 404, Naples,
> Florida and held by 404 Acquisition, LLC, free from any
> claims on the part of Annette and John shall be
> responsible for all claims, assessments, charges, liens and
> obligations related thereto.  Annette agreed to quitclaim
> her interest in said property to John.  However, John shall
> sell this unit within a reasonable period of time from
> September 20, 2019, and shall not purchase or lease
> another unit in the same condominium regime so long as
> Annette owns Unit 2201 there.  Moreover, John agrees
> not to be present or in occupancy at this condominium
> while Annette is present or in occupancy in her
> condominium, Unit 2201 Remington Bay Colony.
> Annette shall provide John notice, either direct or
> through his business assistant, of her plans to be in
> occupancy three days in advance and shall exercise good
> faith not to serve notice of intended occupancy and then
> fail to follow through.

It is undisputed John did not attempt to sell unit 404 until February

2020, approximately five months after he agreed to sell it within a reasonable

period.  When John put unit 404 on the market, he listed it for $5.95 million.  The

substantial increase ($1.65 million) in the price is odd given John's testimony that

unit 404 needed extensive repairs and updates, not to mention the impact coming

with the beginnings of the COVID-19 pandemic.

No renovations or improvements were made on unit 404 from

September 2019 through February 2020.  John testified that prior to any

renovations, only one person viewed unit 404 as a potential buyer. The unit's listing became inactive in September 2020 and was not reactivated until after Annette filed her motion for contempt on December 3, 2020.

While the record is unclear as to when exactly renovations to unit 404 began, it appears renovations were stirring in November 2020. John testified he had to get special permission from the condo association to perform renovations during this time, because the condo association restricts owners from performing any construction work on the units between November and May of each year. Of course, this restriction did not prevent John from doing renovations between June and October of 2020 of which there is no specific evidence. John also testified that due to supply chain and staffing issues caused by COVID-19, it was difficult to get contractors and needed supplies in a timely manner.

In late November 2020, Annette emailed John's assistant to advise she would be in residence at the Remington from November 27 to December 8. During this period, John was also in Naples, at least partly to oversee the renovations to unit 404. John's assistant responded to Annette's email, advising her John would still be in Naples during those dates and would be staying at the Ritz-Carlton Hotel next door to the Remington.

Annette testified she saw John in the Remington parking garage on November 28, 2020. John admitted to being at the condo during that time. John

testified he does not recall seeing Annette, but he "could have been at the condo on that day."

On December 3, 2020, Annette filed a motion for contempt, alleging John was in violation of their DSA, both by being at the Remington at a time when he knew Annette would be there, and by failing to sell unit 404 in a reasonable time. It is undisputed no listing for unit 404 was active at the time the contempt motion was filed.

On December 21, 2020, prior to any hearing on the contempt motion, John transferred condo unit 404 to a trust, the GAB Irrevocable Trust ("Trust"). John is the Grantor of the Trust, and John's daughter, Kristine Nole, was named as the trustee. John contends this transfer of unit 404 to the Trust satisfies the DSA's provision requiring him to sell the unit.

The Trust was created on the same day as the property transfer. Additionally, Trust Article 1, Section B is titled "Power to Substitute Other Trust Property for Trust Corpus." It reads as follows: "The Grantor shall have the right, without the approval or consent of any person in a fiduciary capacity, to reacquire all or any part of the trust corpus by substituting other property of an equivalent value in place of such reacquired trust corpus, until such time as the Trustee receives an acknowledged instrument from the Grantor stating that the Grantor releases said right."

Unit 404 was placed back on the market supposedly by the Trust on December 31, 2020, now at an asking price of $7.25 million. This represents an overall increase in the price of $2.95 million as compared to the original purchase price of unit 404. This is an increase of almost 70% in just over one year. John signed this listing agreement with the realtor. Of course, assuming any legitimacy of the Trust, John would have no authority to list unit 404, as he supposedly did not own it. An amended listing agreement was signed on April 13, 2021, in which John's daughter, the trustee Kristine, signed as seller.

Two days after the amended listing, the family court held a hearing on April 15, 2021, on Annette's motion for contempt. Annette argued John's transfer of the property to the Trust (for consideration of $10.00 per the Deed) was not a sale within a reasonable time per the terms of their DSA. She additionally argued John being present at the Remington on November 28 was a breach of their DSA, as he knew that she would be there on that date. She moved the family court to find John in contempt based on these two breaches. At the hearing, she asked the family court to award her attorney's fees as a sanction.

John argued the transfer of unit 404 to the Trust satisfied the term of the DSA requiring him to sell the property. He stated he no longer had control over the unit. He argued Annette did not specify in the DSA that it had to be an arms-length transaction or that the unit had to be sold to a stranger. He

-6-

argued because he no longer owned the condo unit on the date of the contempt hearing, the issue had become moot. He additionally claimed the timeframe was reasonable, due in part to the COVID-19 pandemic.

Lastly John argued he did not intentionally defy the terms of the DSA by being present in the building on November 28. He stated that once he knew Annette was going to be there during the specified dates, he had to make a choice to either stay away or to continue the renovations on unit 404 to sell it per the terms of the DSA. Annette testified she saw him in the garage on November 28. John stated it is possible she saw him on that one occasion.

During the hearing, John, Charles Jobson, and Kristine Nole testified on John's behalf. Annette was the only witness to testify on her behalf. Charles Jobson is an attorney, licensed in both Kentucky and Florida. He practices in estate planning. He testified the property being transferred to the irrevocable trust was a sale. He testified that in his opinion, the legal effect of John deeding the property to the Trust is the same as if John had deeded it in fee simple to another person. Kristine Nole also testified on John's behalf. She testified that as trustee of the Trust, she has full legal control over the property.

The family court found John in contempt for violating two provisions in the DSA. It found John violated the term of not being present at the same time Annette was present at the condominium. It additionally ruled John had failed to

sell condo unit 404 within a reasonable time. The family court ruled the transfer of the unit to the Trust was not a sale per the terms of the parties' DSA. It also determined even if the transfer did constitute a sale, 15 months was not a reasonable timeframe for a sale.

The family court ordered John to pay Annette's attorney's fees. Additionally, the family court ordered John could not be at the Remington at all for as long as Annette continues to own unit 2201. John filed a motion to alter, amend, or vacate which was denied by the family court. This appeal followed.

## STANDARD OF REVIEW

Appellate review of a finding of contempt is governed by the abuse of discretion standard. *Meyers v. Petrie*, 233 S.W.3d 212, 214 (Ky. App. 2007). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound reasonable principles." *Penner v. Penner*, 411 S.W.3d 775, 779-80 (Ky. App. 2013). The clear error standard applies to the findings of fact. *Cabinet for Health and Family Services v. Ivy*, 353 S.W.3d 324, 332 (Ky. 2011). The terms of a settlement agreement made part of a decree of dissolution of marriage are enforceable as contract terms. KRS[1] 403.180(5). Interpretation of contract terms is a matter of law and shall be reviewed *de novo*. *Money v. Money*, 297 S.W.3d 69, 71 (Ky. App. 2009).

---

[1] Kentucky Revised Statutes.

# ANALYSIS

We start with a necessary recognition of what the DSA requires of John. There are three separate requirements. First, John "shall sell" unit 404. Second, John shall sell unit 404 within a "reasonable period of time from September 20, 2019." Third, John may not be at the Remington when Annette is there.

When these requirements are considered together, the intent is clear. John was to divest himself of ownership of unit 404 by selling it. He was to do so promptly, whether he did so at a profit or loss. Finally, John is not to be anywhere at the Remington when Annette is there. This was designed to achieve a total separation of John and Annette as far as the Remington was concerned.

As we look at the question of contempt, we start with its legal definition. "Contempt is the willful disobedience toward, or open disrespect for, the rules or orders of a court." *Commonwealth v. Burge*, 947 S.W.2d 805, 808 (Ky. 1996). "Civil contempt consists of the failure of one to do something under order of court, generally for the benefit of a party litigant." *Id*.

The evidence presented supports the family court's factual findings as we have recounted them in the preceding background. We focus then on the contentions about what the facts mean for a determination of contempt. We conclude the family court did not err in determining John acted with the required

willful disobedience to justify a finding of contempt. In this regard, we are reminded of the maxim that our actions usually speak louder than our words.

The first issue is the determination of whether the transfer of unit 404 to the Trust was a sale pursuant to the terms of the DSA. John argues the DSA does not require an arms-length transaction. John believes the testimony of Charles Jobson made it clear the legal effect of the transfer to the Trust was the same as if the property were sold to a third party.

John's argument that the transfer to the Trust is a sale stretches the meaning of the word when considered in the confines of the DSA. The transfer certainly was a violation of its spirit. Particularly telling, is the provision in the Trust which allows John, solely by his will, to reacquire any property put into the trust, so long as he substitutes property of equal value. This provision allows John to reacquire unit 404 if he wishes, so long as he puts something of equal value into the Trust. Such a transfer of a $4.3-$7.5 million property for $10 is not a sale as contemplated by the parties or the family court when the DSA was made part of that court's order. This was a clear attempt to get around the agreement in the DSA to sell unit 404.

The terms of a settlement agreement incorporated into a decree of dissolution are enforceable as contract terms. *Cagata v. Cagata*, 475 S.W.3d 49, 56 (Ky. App. 2015). The parties' intentions are to be discerned from the four corners

of the document. *Id.* When we read the DSA as a whole, the parties' intention in requiring John to sell the condo unit was clearly to avoid John and Annette being in the same condominium at the same time. A transfer of the property to a trust in which John can reacquire the property should he wish is clearly against the intent of the parties. We conclude the family court did not err in its finding of contempt in this regard.

Even if we disagreed with the family court's conclusion about the "sale" requirement of the DSA, the analysis cannot end there. The next issue is if the sale was made "in a reasonable time." John argues the family court abused its discretion in finding 15 months is not a reasonable time to sell the condo. Again, based on the facts, we do not believe the family court made an erroneous finding of fact nor abused its discretion.

John urges us to take notice of the COVID-19 pandemic that began in the United States in approximately March 2020 upending all manner of business in the country. John agreed he would sell the property in September 2019. It is undisputed the property was not put on the market until February 2020, approximately five months later. There was little explanation for the delay.

Additionally, John bought the condo in September 2019 for $4.3 million. When it was listed in February 2020, he listed it for $5.95 million, a difference of $1.65 million. John's only argument for such a large increase in

price is that he believed the property would increase in value, and he listed it at that price based on the advice of his realtor.

It is uncontested no renovations had occurred during this time which would justify such a large increase in asking price. In fact, John testified he had trouble selling the unit initially because the unit was in such bad shape. There was no testimony presented which would suggest that other condo units in the building had increased in value during that timeframe. The family court believed that John increased the price to "thwart any real offers to purchase it." This is a reasonable conclusion from the evidence, and we will not disturb the family court's finding.

John is correct that a party cannot be punished for contempt for his failure to perform an act which is impossible. However, "the inability to comply must be shown clearly and categorically by the defendant, and the defendant must prove he took all reasonable steps within his power to insure compliance with the court's order." *Crowder v. Rearden*, 296 S.W.3d 445, 450-451 (Ky. App. 2009). "Kentucky only recognizes impossibility as a defense to contempt where the party claiming it can prove that he is not at fault for his inability to comply." *Kentucky Retirement Systems v. Foster*, 338 S.W.3d 788, 801 (Ky. App. 2010). Thus, it was John's burden to prove impossibility. The family court found John had not met that burden, and we find no basis to reverse this decision by the family court. The directive was to sell unit 404, not to sell it only

-12-

when John decided to do so or only if a profit could be realized. A sale was not impossible.

John asserts the issue was moot at the time of the hearing because he no longer owned the condo unit, and thus complying with the DSA's requirement to sell it then was impossible. However, John still owned the unit at the time the motion was filed, and only after the filing of the motion did he transfer the property to a trust created the same day. At that time, the condo unit had not been actively listed on the market for approximately three months. The timing of the creation of the trust and the transfer of the unit into the trust is suspect.

If John truly believed that the transfer to the Trust satisfied the terms of the DSA, it is questionable why he did not do so earlier. Instead, he waited until a motion for contempt was filed, and then made this transfer as a last-ditch effort to avoid contempt and claim it was impossible to comply with the DSA. John cannot have it both ways. If the trust transfer was legitimate under the DSA, John could have done this immediately. There was no reason for fifteen months to pass before the transfer. Again, the circumstances suggest the transfer was done with an intent to avoid the real requirement of a sale of the property.

The issue of what a "reasonable" timeframe looks like is a question of fact for the circuit court. *Campbell County v. Commonwealth of Kentucky, Corrections Cabinet*, 762 S.W.2d 6, 15 (Ky. 1988). A circuit court's answer to

this question should not be set aside unless clearly erroneous. *Id.* The family court did not believe John took all necessary steps to ensure compliance. The family court found that John "escalated the sales price of the condo so as to thwart any real offers to purchase it."

There is no justification given for a $1.65 million increase in a condo unit over the period of five months, when no renovations or improvements had been completed. Additionally, John waited five months to list the condo unit, with no reason given for the delay. While the COVID-19 pandemic certainly made it substantially more difficult to sell real estate post-March 2020, it does not explain the delay in the listing of the property or the huge increases in asking price.

The second issue we address is the family court's finding that John violated the provision of the DSA prohibiting him from being present at the condo while Annette is there. Annette testified she provided notice to John, via email to his assistant, that she would be at the condominium from November 27 to December 8. John acknowledges having been notified. John's assistant replied stating John would be in Naples during those dates, but he would be staying at the Ritz-Carlton which was next door to the condominium.

Annette further testified she saw John in the parking garage of the condominium on November 28, 2020. John admits he was at the condo during this timeframe, as he was overseeing the renovations of unit 404. Since John's counsel

inexplicably brought up the issue, we note John may have also been using the private beach the Remington and the Ritz-Carlton share, as if that would provide any legitimate excuse for the DSA violation. John cannot be on any Remington property, including a shared private beach, when Annette is there.

John insists because Annette was at the condo during the time when renovations were occurring, he had to be there to obey the provision to sell the condo unit. This is a false dichotomy. John provides no meaningful reason why he had to go to the Remington in person during the period when Annette was there. John obviously had no issue with delaying renovations. They could have been delayed while Annette was there. Also, there is adequate technology available to communicate with any workers who would be providing services. The family court found that John went to the condo, knowingly and willingly violating the court's order, and we do not believe that finding is clearly erroneous. The family court's finding that John was in contempt of both provisions in the DSA was not an abuse of discretion.

We next address the family court's sanctions for John's contempt findings. The family court ordered John to pay Annette's attorney's fees of $4,419 and ordered him to refrain from going to the condominium so long as Annette owns her unit there. John contends the order of attorney's fees was an abuse of

discretion and that the court erred as a matter of law in prohibiting him from being present at the condominium.

We will first discuss the award of attorney's fees. We do not find this sanction an abuse of discretion. "The purpose of civil contempt authority is to provide courts with a means for enforcing their judgments and orders, and trial courts have almost unlimited discretion in applying this power." *Smith v. City of Loyall*, 702 S.W.2d 838, 838-39 (Ky. App. 1986). "The trial courts are afforded wide latitude in the use of their contempt powers to enforce their judgments and remove any obstructions to such enforcement." *Lanham v. Lanham*, 336 S.W.3d 123, 128 (Ky. App. 2011). "Indeed, trial courts have almost unlimited discretion in exercising their contempt powers and we will not disturb a trial court's exercise of its contempt powers on appeal absent an abuse of that discretion." *Id.*

The Court found, based on Annette's testimony, she had concerns for her safety when John was in the same building. John asked the court to strike that finding, which the family court denied. Whether Annette feared for her safety in John's presence is clearly a factual finding. "A family court operating as finder of fact has extremely broad discretion with respect to testimony presented, and may choose to believe or disbelieve any part of it. A family court is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses, and a reviewing court is not permitted to substitute its judgment for that of the family

-16-

court, unless its findings are clearly erroneous." *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007). The award of attorney's fees may serve to get John's attention before sanctions became more severe for future infractions.

The granting of attorney's fees is a common sanction for contempt in civil and family court hearings. *See Crowder*, 296 S.W.3d 445, *Foster*, 338 S.W.3d 788. An award of attorney's fees has been granted to parties in family cases as a sanction for bad behavior even absent an official finding of contempt. *See Gentry v. Gentry*, 798 S.W.2d 928 (Ky. 1990), *Smith v. McGill*, 556 S.W.3d 552 (Ky. 2018). Had John obeyed the orders in the parties' DSA, there would have been no need to file a contempt motion, and therefore no need for Annette to have incurred attorney's fees. "The amount of an award of attorney's fees is committed to the sound discretion of the trial court with good reason." *Gentry*, 798 S.W.2d at 938. "[T]here is no abuse of discretion nor any inequity in requiring the party whose conduct caused the unnecessary expense to pay it." *Id.*

We do find that the family court erred in prohibiting John from being present at the condo, even when Annette is not there. The family court is essentially altering a term of the parties' DSA *sua sponte*. The "terms of [a] separation agreement are binding on the court." *Tilley v. Tilley*, 947 S.W.2d 63, 65 (Ky. App. 1997). A family court lacks power to modify a negotiated settlement agreement in a dissolution action. *Richey v. Richey*, 389 S.W.2d 914 (Ky. App.

-17-

1965).  Neither party asked for a modification of the terms of the DSA, and it was error for the family court to modify a term on its own.

Nor is this amendment an appropriate use of the family court's contempt power.  When contempt is civil in nature, "the sanction may serve either to coerce the contemnor to comply with a court order, to compensate a party for losses caused by the contempt, or both."  *Ivy*, 353 S.W.3d at 334.  The new condition imposed in this case does neither.  Rather, it changed the DSA incorporated in the court order.

While an award for attorney's fees compensated Annette for the cost of bringing the successful contempt motion, disallowing John to be at the condo, even when Annette is not present, serves no purpose with respect to future compliance. Annette testified that she was concerned by John's behavior around her, which was why the parties agreed for him not to be present in the condo building when she was in residence.  No further purpose is served by prohibiting him from being there when she is not.

## CONCLUSION

For the foregoing reasons, we AFFIRM the Oldham Family Court's finding of contempt and award of attorney's fees and REVERSE the family court's order prohibiting John from being at the Remington condo at any time while

Annette owns her unit. The parties' agreement in the DSA barring John from being present when Annette is in residence remains controlling.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Allison S. Russell
Rebecca M. Simms
Shanna R. Ballinger
Louisville, Kentucky

BRIEF FOR APPELLEES:

Melanie Straw-Boone
Stuart A. Scherer
Louisville, Kentucky